# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**04-222**


RONALD LANCLOS

VERSUS

COASTAL FOOD, LLC


********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 02-01270
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

********

**MARC T. AMY**
**JUDGE**

********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billie Colombaro Woodard, and Marc T. Amy, Judges.

**AFFIRMED AS AMENDED.**

**Douglas J. Cochran**
**McKay, Williamson, Lutgring & Cochran**
**723 North Boulevard**
**Baton Rouge, LA 70802**
**(225) 389-1060**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Coastal Food, LLC**

**Harry K. Burdette**
**The Glenn Armentor Law Corporation**
**300 Stewart Street**
**Lafayette, LA 70501**
**(337) 233-1471**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Ronald Lanclos**

AMY, Judge.

In this workers' compensation matter, the employee-claimant contested the termination of his indemnity benefits and also sought attorney's fees and penalties, alleging that the employer had improperly calculated his average weekly wage and the corresponding weekly indemnification rate; had untimely paid weekly indemnity and medical benefits; had untimely approved medical benefits; had failed to approve his choice of physician; and had failed to timely provide a copy of a second medical opinion examination performed at the employer's request. The employer, in turn, argued that the employee's benefits were terminated because he failed to truthfully disclose a prior neck injury, thereby committing fraud. After a hearing, the workers' compensation judge ruled in favor of the employee. The employer's workers' compensation insurer appeals. For the following reasons, we affirm the ruling as amended.

**Factual and Procedural Background**

The record indicates that during the early morning hours of February 21, 2001, Ronald Lanclos (hereinafter "Mr. Lanclos" or "the claimant"), a delivery driver for Coastal Food, L.L.C., was working at a dock in Cameron, Louisiana, loading groceries into a metal container for transport offshore. At the disputed-claim hearing in the matter, Mr. Lanclos testified that this particular container previously held used cooking oil that had been shipped back to land from offshore, and some of this oil had leaked onto the container's floor. Mr. Lanclos recalled that when he had filled the container between one-half and three-quarters full, he slipped on the cooking oil and struck the side of the container's metal doorframe from the center of his back to the back of his neck. He testified that because the injury occurred in the early morning hours, there was no one at Coastal's office to whom he could report the injury, but

after the office opened in the morning, he spoke with office personnel and came in to file an accident report.

Mr. Lanclos testified that when it was apparent that his injury would not resolve itself, he went to the emergency room at Opelousas General Hospital. The record reflects that during this initial visit to Opelousas General, a CT scan was performed, and the results showed injuries to Mr. Lanclos' spine. Accordingly, the emergency-room physician referred him to Dr. Morgan Lorio, an orthopedist, for further treatment. Dr. Lorio, in turn, ordered an MRI, which also indicated spinal injuries. However, the record reflects that Mr. Lanclos' treatment with Dr. Lorio ceased when Dr. Lorio closed his practice in Louisiana and moved to Tennessee. Accordingly, Mr. Lanclos contacted his employer's workers' compensation insurer, Louisiana Restaurant Association Self Insurers Fund ("LRASIF"), and requested approval to consult Dr. Michel Heard, an orthopedist, for further treatment. Dr. Heard subsequently recommended that the claimant consult Dr. Alan Appley, a neurosurgeon. Mr. Lanclos asserted at the disputed-claim hearing that Coastal Food and LRASIF never approved treatment with Dr. Heard and never paid any of the associated costs incurred; in addition, he pointed out, Coastal Food and LRASIF never paid any of his medical expenses. Moreover, the claimant noted that as of the time of hearing, an MRI requested by Dr. Heard had not been approved.

Mr. Lanclos filed the initial disputed claim on February 21, 2002, in which he complained that his wage benefits had been terminated or reduced on or around March 5, 2001. In his first amendment to the disputed claim, filed March 26, 2003, Mr. Lanclos asserted that Coastal Food and LRASIF had improperly calculated his average weekly wage and his weekly indemnification rate; that they had untimely paid weekly indemnity benefits; that they had untimely approved and untimely paid

2

medical benefits; and that they had failed to approve the claimant's choice of physician in the field of orthopedics, Dr. Michel Heard. Moreover, in his pre-trial statement, Mr. Lanclos requested attorney's fees and penalties for arbitrary and capricious conduct. In yet another amendment to the original disputed claim filed before the hearing, Mr. Lanclos insisted that Coastal Food and LRASIF did not timely provide him a copy of a second medical opinion report and sought penalties and attorney's fees accordingly. In the meantime, Coastal Food and LRASIF filed a disputed-claim form on August 13, 2001, in which they explained that the claimant's benefits were suspended due to his not having accepted light-duty work offered by Coastal Food and for failing to truthfully inform Coastal of his prior medical condition.[1]

The instant claim was heard by a workers' compensation judge on November 7, 2003. During the proceedings, Newton Thomas, the insurance adjuster assigned to the case, testified that Mr. Lanclos' benefits were terminated based upon what he perceived to be fraudulent conduct on Mr. Lanclos' part. Mr. Thomas stated that he was suspicious of Mr. Lanclos' claims owing to inconsistencies in the manner in

---

[1]This matter was also heard by the Second Injury Board, who denied LRASIF's claim in a ruling signed July 12, 2002. Its report contains the following findings of fact:

> On or about February 20, 2001 while in the course and scope of employment, the employee was injured while taking some used containers of grease out of the grocery box.
>
> The accident occurred on February 20, 2001. The first weekly compensation benefits were paid on March 12, 2001 and the claim was filed with the Second Injury Board on December 19, 2001; therefore, it was timely filed.
>
> There is no evidence that the employee had the pre-existing permanent partial disability as defined by R.S. 23:1378(F) prior to the subsequent injury of February 20, 2001.
>
> The employer has not established that they had knowledge of the employee's pre-existing permanent partial disability (if any) prior to the subsequent injury of February 20, 2001, as required by R.S. 23:1378(A).
>
> Further, the Second Injury Board finds that even if there were a pre-existing permanent partial disability that would meet the requirements of R.S. 23:1378(F), it would not merge or combine with the subsequent injury in accordance with R.S. 23:1371(C). Additionally, the Second Injury Board finds that the subsequent injury was not caused or brought about by the existence of any pre-existing disability.

which he described the accident to his superiors at Coastal. Mr. Thomas further indicated that he decided to terminate the claimant's benefits under La.R.S. 23:1208.1 in consideration of the following factors: (1) the claimant had not disclosed prior medical history on his post-hire questionnaire; (2) he had not told the truth and failed to mention his prior neck problem during his recorded statement; (3) he told Drs. Morgan Lorio and Greg Gidman about his prior neck injury but did not tell Mr. Thomas; and (4) certain information found in the records of Dr. Thomas Bertuccini, who treated the claimant for an injury sustained in 1994. Mr. Thomas pointed out that the claimant's prior medical history, as outlined by Drs. Lorio and Gidman, reflected that the claimant had complained of neck pain before the accident at issue. Mr. Thomas further explained that the claimant's prior neck injury had been documented as a herniated cervical disc and that this was confirmed by MRI. He noted that after Mr. Lanclos told him that he had hit his neck and shoulder in a previous accident, during the recorded statement taken by phone on February 23, 2001, he did not ask specific questions about his neck; however, he said that when he asked the claimant what kind of treatment was provided, this was the claimant's opportunity to explain his injury, his "chance to take the ball and run with it." However, the claimant did not provide further information.

Mr. Lanclos testified at the hearing in the matter that he was involved in an accident in 1994 while working offshore for ENSCO Marine, explaining that he hit a constavolt box with his shoulder when he was trying to change a fly wheel on a generator on board a ship. The claimant indicated that he filled out an accident report but did not consult a physician until a fire aboard the ship resulted in a lull in his employment. He recalled that upon seeking medical attention, the injury was "worse than [he initially] thought," and his treating physician referred him to Dr. Thomas

Bertuccini, a Lafayette neurosurgeon. At the hearing below, the claimant maintained that Dr. Bertuccini did not tell him that something was wrong with his neck but merely referred him to Dr. Robert Franklin, a physical medicine and rehabilitation specialist. Dr. Franklin, in turn, ordered a myelogram and a post-CT scan, both of which Mr. Lanclos described as "negative." The claimant was then released from physicans' care.

During the proceedings below, Mr. Lanclos contended that the 1994 accident resulted in a shoulder injury and that this shoulder injury was the focus of all medical treatment that he received. The claimant maintained that no one told him anything about herniated discs. He likewise insisted that no doctor had previously told him that he might need neck surgery. The claimant further recalled that an MRI showed a small herniated disc at C4-5 that his treating physician described as "inconsequential," and he pointed out that this "herniation" did not appear on a myelogram. In fact, Mr. Lanclos stated, this physician released him without informing him that he had a cervical problem. However, with respect to the present state of his cervical spine following the 2001 injury, the claimant indicated that there were problems with two to three discs, one of which needed to be removed. He further commented that he has conferred with Dr. Heard about this prospective surgery, and Dr. Heard has instructed him not to work.

The workers' compensation judge ruled in favor of Mr. Lanclos, awarding him, *inter alia*, temporary total disability benefits, medical expenses, and attorney's fees. From this judgment, LRASIF appeals, asserting the following assignments of error:

> 1. The trial court erred in its determination that Coastal and LRASIF did not establish that Mr. Lanclos committed fraud in violation of La.R.S. 23:1208.1, particularly in finding that Mr. Lanclos' untruthful answers were not directly related to the medical condition at issue.

2. The trial court erred in concluding that Coastal and LRASIF did not establish that Mr. Lanclos committed fraud in violation of La.R.S. 23:1208.1, particularly in determining that Mr. Lanclos' untruthful answers did not affect Coastal's ability to receive Second Injury Fund reimbursement, in that Coastal could not establish that Mr. Lanclos suffered a previous permanent partial disability pursuant to La.R.S. 23:1378.

3. The trial court erred in granting attorney's fees and penalties, as Coastal did not act arbitrarily, capriciously, or without probable cause in this matter.

Mr. Lanclos answers the appeal, seeking attorney's fees for the improper calculation of his average weekly wage and penalties for the employer's improper termination of indemnity benefits, untimely payment of medical and pharmacy bills, and failure to approve treatment with Drs. Heard and Appley. Mr. Lanclos also requests an award of attorney's fees for efforts in defense of the instant appeal.

**Discussion**

*Louisiana Revised Statute 23:1208.1*

In its first two assignments of error, LRASIF contends that the workers' compensation judge erred in concluding that Mr. Lanclos had not committed fraud in violation of La.R.S. 23:1208.1. In particular, LRASIF asserts that the trial court erred in concluding that Mr. Lanclos' allegedly untruthful statements were not related to the medical condition at issue and in concluding that any untruthful answers did not affect its ability to recover from the Second Injury Fund. We turn to consideration of the statute and the trial court's findings regarding the statute.

Louisiana Revised Statute 23:1208.1, relied upon by LRASIF in support of its decision to terminate Mr. Lanclos' workers' compensation benefits, provides as follows:

> Nothing in this Title shall prohibit an employer from inquiring about previous injuries, disabilities, or other medical conditions and the employee shall answer truthfully; failure to answer truthfully shall result

6

in the employee's forfeiture of benefits under this Chapter, provided said failure to answer directly relates to the medical condition for which a claim for benefits is made or affects the employer's ability to receive reimbursement from the second injury fund. This Section shall not be enforceable unless the written form on which the inquiries about previous medical conditions are made contains a notice advising the employee that his failure to answer truthfully may result in his forfeiture of worker's compensation benefits under [La.]R.S. 23:1208.1. Such notice shall be prominently displayed in bold faced block lettering of no less than ten point type.

In *City of Eunice v. Carrier*, 01-1184, pp. 3-5 (La.App. 3 Cir. 2/20/02), 821 So.2d 3, 7-8, a panel of this court presented the following summary of the elements necessary to establish a case of fraud that would serve to forfeit a claimant's benefits pursuant to La.R.S. 23:1208.1:

> There are three component parts to establishing a Section 1208.1 violation: (1) untruthfulness; (2) prejudice; and (3) notice.
>
> Furthermore, the claimant must do more than simply provide untruthful answers before forfeiting benefits. The employer must also prove that the untruthful statements were prejudicial to it and that it provided the employee with statutory notice. La.R.S. 23:1208.1 applies when an employee is dishonest on an employer's medical questionnaire before the accident or injury. [*Resweber v. Haroil Const. Co.*, 94-2708, 94-3138 (La.9/5/95), 660 So.2d 7.] In *Resweber* [*Id.*], the supreme court concluded that the legislature imposed forfeiture under La.R.S. 23:1208.1 strictly for when the employer suffers prejudice. An employer is prejudiced only when the false statement "directly relates to the medical condition for which a claim is made or affects the employer's ability to receive reimbursement from the second injury fund." [La.R.S. 23:1208.1.] An untruthful statement on the questionnaire regarding a preexisting condition, may be prejudicial to the employer's ability to recover from a second injury fund. [*Resweber*, 660 So.2d 7.]
>
> The employer may obtain medical information from the employee about preexisting conditions. By reviewing the information provided on the medical history questionnaire, the employer may determine if he has hired a worker with a permanent partial disability for second injury fund purposes. [*Wise v. J.E. Merit Constrs., Inc.*, 707 So.2d 1214.] Permanent partial disability is statutorily defined as "any permanent condition, whether congenital or due to injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining reemployment if the employee should become injured." [La.R.S. 23:1378(F).]

7

Because statutory forfeiture is a harsh remedy, its application must be strictly construed. . . .

. . . .

Moreover, in *Wise* [707 So.2d at 1217], the Louisiana Supreme Court stated:

> A work injury subsequent to a known permanent partial disability qualifies an employer to seek reimbursement for worker's compensation benefits from a statutorily designated "Second Injury Fund" under certain circumstances. A claimant's untruthful statement regarding his permanent partial disability which prejudices his employer's ability to seek reimbursement from the fund gives rise to an affirmative defense under La.R.S. 23:1208.1, whereby the injured employee forfeits all compensation benefits.

> Thus, forfeiture should occur under narrow circumstances. "There must be an untruthful statement; prejudice to the employer; and compliance with the notice requirements of the statute. An employer has the burden of proving each element within the statute. The lack of any one of the elements is fatal to an employer's avoidance of liability." [*Id.* at 1218.]

With respect to an employer's inquiries as to an employee's medical history, a panel of this court, in *King v. Grand Cove Nursing Home*, 93-779, p. 5 (La.App. 3 Cir. 3/9/94), 640 So.2d 348, 351, *writ denied*, 94-865 (La. 5/13/94), 641 So.2d 204, commented that "[w]hen there is any legitimate ambiguity concerning the questionnaire or inquiries into an employee's medical history, a court should lean favorably toward the employee in determining whether he knowlingly [sic] failed to answer the questionnaire truthfully." Further examination of the above-cited opinion in *Wise*, in which the supreme court comments on *King*, is also helpful in this respect:

> In *King v. Grand Cove Nursing Home*, a questionnaire not narrowly tailored to provide the employer with knowledge about preexisting conditions prejudicial to the employer's second injury fund reimbursement potential was found ambiguous. 93-779 (La.App. 3 Cir. 3/9/94), 640 So.2d 348, *writ denied*, 94-0865 (La.5/13/94), 641 So.2d 204. The *King* court observed that overly broad questions "could well be interpreted as referring to a chronic or long standing condition." *Id.* at 352. We note that under those circumstances, the questions do not serve the purposes of La.R.S. 23:1208.1 for which the legislature granted

8

the employer the right to make inquiries. On the contrary, such questions are meaningless for the statute's intended purpose. Therefore, we agree with *King* that such ambiguous questionnaires are to be construed against the employer in determining whether the employee knowingly failed to answer the questionnaire truthfully.

*Wise*, 707 So.2d at 1219.

In his oral ruling, the workers' compensation judge made the following comments regarding Coastal's assertion that Mr. Lanclos committed fraud in violation of La.R.S. 23:1208.1:

It's been put forth that Mr. Lanclos had violated Revised Statute 23:1208.1, which is case [sic] that applies to a false statement made prior to any job action having taken place. . . .

. . . .

What are the requirements to receive reimbursement from the second injury fund? First, that there be a previous existing permanent partial disability. Without a pre-existing permanent partial disability, it makes not one iota what knowledge the employer has of any past medical condition. They simply would not be able to recover from the second injury fund because there's no previous permanent partial disability. 23:1378-F has a listing of some 29 or 30 items which are presumed to be permanent partial disabilities. A simple neck injury is not listed in there, so if he had some previous neck injury, that's not presumed to be a permanent partial disability, and it must be proven that that was a permanent partial disability. Item 26 is a ruptured intervertebral [sic] disc, which is assumed to be a permanent partial disability. Dr. Bertuccini's testimony in his deposition was that when he discussed what he found on the MRIs with Mr. Lanclos, he's 99 percent sure he never used the term "ruptured." I asked Mr. Thomas if he knew what that term meant, and he said he had to refer to his nurses. I asked Mr. Boudreaux [Coastal's general manager] if he knew what a ruptured intervertebral [sic] disc meant. He didn't know. I'm certainly positive Mr. Lanclos has not a clue what the difference is between a ruptured disc, a herniated disc, a bulging disc. I've applied the ordinary meaning of the word "ruptured" to the statute and referred to the Webster's Dictionary – the New Riverside University Dictionary – they've got about a million Webster's Dictionaries now – and it defines it, "The process of breaking open or bursting. The state of being open or burst." We all know that there are bulging discs which do not impinge the cords, there are bulging discs which impinge the spinal cords [sic], and that there are frankly ruptured discs where the cartilage and disc fragments which encompass the jelly-like substance to constitute the shock-absorbing effect of a disc bust [sic] open, and those fragments come out and impinge the cord. It's my conclusion that no doubt, that's what has been referred to in 23:1378-F, Sub-section [sic] 26, when they talk about ruptured intervertebral [sic]

9

discs. Of course, there's been no showing in this case that Mr. Lanclos ever had such a ruptured disc in the past. There's been no showing from the records of Dr. Bertuccini, Dr. Franklin or any physician in this case, for that matter, that Mr. Lanclos was ever assigned a percentage disability or restricted permanently from performing full and heavy duty work from any incident that may have occurred in 1994. What one really finds when one does a thorough review of those records in the past is that, in fact, Mr. Lanclos injured his shoulder and went to Dr. Gaar, the first doctor, and he says, "I've injured my shoulder, and I want you to check out my shoulder," which is what Dr. Gaar begins to check out. Then Mr. Lanclos gets himself an attorney. They can't seem to be finding [sic] anything wrong with his shoulder. The attorney makes the suggestion, "Why don't we send him to a neurosurgeon and see if we can check this out further?" Hence, he gets to [sic] Dr. Bertuccini, who does the test of the MRI. His records are not clear whether there's a focal protrusion, a herniation. It's certainly clear that there is no rupture, but his records are also clear that the source of Mr. Lanclos' neck pain from the 1994 incident was not anything [sic] to do with the conditions found in his neck at that time by any of the studies. The employer had Dr. Gidman review all the previous records and review the films. Dr. Gidman noted that a myelogram and a post-myelogram CT is a much more sophisticated and sensitive test than an MRI. In his conclusion [sic] from the review of the previous MRI and the post-myelogram CT scan was that there was no protrusion or herniation at C5-6 in the past. It was merely bony hypertrophy, a mild arthritic condition. I could find no questioning of any other physicians as to whether or not the past medical conditions identified in Mr. Lanclos' neck made it inevitable that his current condition would be directly related to the past problems. There seems to be an implication of that in Dr. Lorio's medical records, but we don't have the deposition of Dr. Lorio. We have the information from Dr. Bertuccini that that wasn't even the source of his problem in the past, and we have Dr. Gidman's testimony that he couldn't make that relationship, either – that he thought it was arthritis, and arthritis progresses over time. Maybe it's possible, but he couldn't say for sure. So it's pretty obvious to this Court that the underlying crux of the 23:1208.1 [sic] is that there has been a misrepresentation about a known pre-existing permanent partial disability which requires somewhere in the record, the proof of a known pervious partial disability, and I don't find it in this record anywhere. And I have reviewed it very thoroughly. The records indicate that the subsequent MRIs taken after the accident in question do show changes or differences than those found in the previous MRIs, which was acknowledged by Dr. Gidman in his deposition. Dr. Lorio took Mr. Lanclos off of work. Dr. Gidman said he might be able to do light-duty work. I don't accept the testimony of Mr. Simon and Mr. Boudreaux that they offered light duty to Mr. Lanclos, and he declined coming back, because that's simply contrary to the record and common sense because he went to work at Acadiana Textiles, where they didn't offer him any light duty. . . . [Mr. Lanclos is] not a very credible human being, I must admit. He has not made, from the

10

records I've seen, truthful comments in his job applications to Acadiana Textiles. He claimed to work with some flatbed trucking company, and he testified in court, "No, I never worked there." And he seems to have the response to, "I don't remember" [sic] to too many questions posed to him in the trial today. But nevertheless, he has shown that he had the job accident, and he's had a neck injury, and the medical records show that it appears to be a pretty significant job injury at this time. . . .

I find the termination of benefits to be arbitrary and capricious, given the fact that there was never any indication or showing in any record that there is ever a previous permanent partial disability, nor that his previous problem had any relationship to his current medical problem. . . .[2]

In general, an appellate court reviews the factual determinations of a workers' compensation judge pursuant to the manifest error—clearly wrong standard. *Apeck Constr., Inc. v. Bowers*, 03-486 (La.App. 3 Cir. 12/10/03), 862 So.2d 1087, *writ denied*, 04-459 (La. 4/23/04), ___ So.2d ___. This is likewise the standard of review where an employer has alleged that a claimant has committed fraud pursuant to La.R.S. 23:1208.1. *See Colonial Nursing Home v. Bradford*, 02-588 (La.App. 3 Cir. 12/30/02), 834 So.2d 1262, *writ denied*, 03-364 (4/21/03), 841 So.2d 802. Where conflict in testimony arises, a workers' compensation judge's reasonable factual inferences and reasonable assessments of credibility are not to be disturbed on appeal, despite the beliefs of a reviewing court that its inferences or evaluations are more reasonable. *Williamwest v. Am. Studios/PCA Int'l, Inc.*, 02-98 (La.App. 5 Cir. 9/30/02), 827 So.2d 526. However, an appellate court may conclude that the workers'

---

[2]The worker's compensation judge likewise issued a written ruling on November 7, 2003, in which the following findings were outlined: (1) Mr. Lanclos sustained a work-related accident, thereby entitling him to temporary total disability benefits; (2) Coastal Food and LRASIF are liable for back temporary total disability benefits from March 12, 2001 (the date of their termination) through August 20, 2001, and from March 13, 2002, on; (3) Coastal Food and LRASIF are also liable for the payment of medical expenses as a result of the accident; (4) Coastal Food and LRASIF must supply future reasonable and necessary medical treatment, including referral to Dr. Alan Appley, neurosurgeon; (5) the correct figure for Mr. Lanclos' average weekly wage is $360, corresponding with a weekly indemnity rate of $240; (6) Coastal Food and LRASIF shall pay the claimant's costs associated with the deposition of Dr. Bertuccini and the court reporter's fees for the deposition transcripts of Dr. Franklin and Dr. Heard; (7) Coastal Food and LRASIF are assessed $8,500 in attorney's fees; and (8) Coastal Food and LRASIF are to pay all costs and interest.

compensation judge's findings were manifestly erroneous or clearly wrong, even when ostensibly based upon a credibility determination, "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story[.]" *Town of Grand Isle v. Eschette*, 02-96, p. 8 (La.App. 5 Cir. 5/29/02), 820 So.2d 1122, 1128, *writ denied*, 02-1810 (La. 10/4/02), 826 So.2d 1131. (quoting *Bruno v. Harbert Int'l, Inc.*, 593 So.2d 357, 361 (La.1992)).

Of the three factors for recovery under La.R.S. 23:1208.1 discussed in *Wise*, as stated above, LRASIF focuses its argument on that regarding prejudice to the employer. LRASIF's contention in this respect centers on this second factor and assumes that "untruthful" statements were made and were accepted to be as such by the workers' compensation judge. LRASIF further asserts that the workers' compensation judge did not squarely address the elements of untruthfulness and notice. However, our review of the workers' compensation judge's oral reasons for ruling, excerpted above, indicates that the workers' compensation judge did, in fact, address the issue of untruthfulness, referencing both the nature and the state of the prior injury and the degree of the claimant's understanding. We note that the supreme court has held, with respect to allegations of fraud under La.R.S. 23:1208.1, that "[a]n employer has the burden of proving each element within the statute. The lack of any one of the elements is fatal to an employer's avoidance of liability." *Wise*, 707 So.2d at 1218. Accordingly, if the workers' compensation judge's findings regarding the claimant's truthfulness in this matter are supported by the record, LRASIF's argument regarding prejudice to the employer, even if meritorious, must fail.

In our review of the medical records, depositions, and other evidence presented in this matter, we have found nothing that definitively establishes that any treating

12

physician informed the claimant that he had a cervical disc herniation after the 1994 accident. LRASIF cites Dr. Franklin's deposition in support of its assertion that Mr. Lanclos was aware of the nature of his injury; however, an examination of this deposition reveals that Dr. Franklin merely stated that he "more likely than not" informed Mr. Lanclos that he had sustained a herniation, and he was unable to independently recall whether he had, in fact, done so. Dr. Bertuccini stated in his deposition that he was "ninety-nine percent sure" that he never used the term "ruptured" in discussing Mr. Lanclos' condition with him. Dr. Bertuccini likewise found that the small central disc herniation shown in an MRI of January 20, 1995, was inconsequential and was not related to the claimant's symptoms. Moreover, LRASIF concedes that neither Dr. Bertuccini nor Dr. Jack Hurst, the independent examining neurosurgeon, recommended surgery. In addition, we note that many different MRI's, myelographs, and post-myelographic CT scans have been taken of the claimant's cervical spine since 1994, and the various radiologists, orthopedists, and physicians who have interpreted these reports have issued varying impressions, ranging from spondylosis and bony hypertrophy to moderate or significant disc herniations. In our view, if the examining physicians are not at a consensus as to the claimant's condition, then the claimant himself would not have precise knowledge of his condition, either; in particular, he would not have the prior knowledge that would facilitate making untruthful statements in violation of La.R.S. 23:1208.1. Our review of the record indicates support for the workers' compensation judge's statements in his oral reasons for ruling regarding the lack of a clear diagnosis provided to the claimant herein.[3] We

---

[3]As reproduced earlier in this opinion, the workers' compensation judge made the following findings regarding Mr. Lanclos' truthfulness as to the nature of his prior injury:

Dr. Bertuccini's testimony in his deposition was that when he discussed what he found on the MRIs with Mr. Lanclos, he's 99 percent sure he never used the term "ruptured[]" . . . . I'm certainly positive Mr. Lanclos has not a clue what the

note that pursuant to *Wise*, above, if a claimant has no knowledge of a preexisting partial permanent disability, there can be no fraud. As we conclude that the workers' compensation judge's finding as to the first element of the test for fraud outlined in *Wise* is supported by the record, this pretermits discussion of LRASIF's assertions regarding prejudice.

*Penalties and Attorney's Fees*

In its final assignment of error on appeal, LRASIF contends that the workers' compensation judge incorrectly determined that an award of attorney's fees and penalties was warranted due to arbitrary and capricious conduct in this matter. It argues, citing *Sharbono v. Steve Lang & Son Loggers*, 97-110 (La. 7/1/97), 696 So.2d 1382, that neither an employer's subjective motivation to avoid paying compensation nor the employer's defeat at hearing is an absolute indicator of arbitrary and capricious conduct on the employer's part. LRASIF claims that the present case involves closely disputed factual questions, and it insists that it conducted an adequate investigation before denying Mr. Lanclos' benefits. LRASIF further argues that this matter involved tremendous credibility issues and medical evidence, which it claims establishes a reasonable basis for termination of benefits.

In his deposition, Mr. Thomas, the LRASIF adjuster in charge of Mr. Lanclos' claim, explained that he learned that Mr. Lanclos was under the medical care of Dr. Lorio and that Dr. Lorio felt that he was unable to work; accordingly, he arranged a second medical opinion with Dr. Greg Gidman. Mr. Thomas further stated that Mr. Lanclos' claim was denied because he did not tell the truth about his medical history, commenting that the issue was not whether, in fact, he had sustained an injury.

difference is between a ruptured disc, a herniated disc, a bulging disc.

14

Based upon our examination of the record, we do not find that the workers' compensation judge erred in assessing attorney's fees and penalties against Coastal Food and LRASIF for their arbitrary and capricious conduct in handling Mr. Lanclos' claim. Neither the MRIs or CT scans referenced in the record nor the various diagnoses of Mr. Lanclos' condition establish with any certainty that he had a prior cervical disc herniation. The record further indicates that, besides asking Dr. Gidman for a second medical opinion, Mr. Thomas undertook no further inquiry as to Mr. Lanclos' condition and decided to terminate Mr. Lanclos' benefits, despite differing opinions as to the nature of Mr. Lanclos' prior injury among his examining physicians, and despite a report from Dr. Gidman that Mr. Lanclos had not sustained a cervical herniation.

According to the record, Dr. Gidman diagnosed Mr. Lanclos with a contusion of the thoracic spine, noting that although Mr. Lanclos complained of "cervical" pain, he was pointing to the upper thoracic region in showing Dr. Gidman where it hurt. Dr. Gidman noted that upper-thoracic pain is not the same thing as neck pain and explained that physicians often have to get patients to physically point to the location of the symptoms instead of merely stating where they are, as what patients say is not always where it actually hurts. Dr. Gidman noted that in examining the CT scan performed at Opelousas General Hospital, he found no evidence of a herniation. Dr. Gidman stated that in his opinion, the 2001 injury probably aggravated an arthritic condition in Mr. Lanclos' neck and that this, and not a herniated disc, was the source of his problem. Dr. Gidman also examined the results of a May 20, 2003 myelogram and CT scan administered at Dr. Heard's office, in which he detected no evidence of herniation or disc protrusion; instead, he described moderate stenosis from spondylosis. The record indicates that Dr. Heard also reached these conclusions. In

15

addition, Dr. Gidman examined the MRI of Mr. Lanclos' cervical spine dated January 20, 1995, and concluded that the condition displayed therein was merely bony hypertrophy. However, with respect to this same MRI, Dr. Bertuccini opined that it indicated a very small central focal disc protrusion, although it "is likely inconsequential;" Dr. Bertuccini further concluded that the post-myelograph CT scan showed only mild spondylosis. The evidence entered into the record contains correspondence between Dr. Franklin and Dr. Bertuccini in which Dr. Franklin indicates that an MRI of March 13, 1995, indicates a small cervical disc herniation. However, Dr. Bertuccini's records contain a post-myelograph CT scan of Mr. Lanclos' cervical spine dated March 14, 1996, in which the radiologist described only mild spondylosis. Furthermore, although Dr. Lorio's report of March 19, 2001, indicated a diagnosis of cervical strain "with known history of preexisting cervical disc herniation at C5/C6," he does not specify the records upon which he bases the "known history." Based upon comparison of the various medical records submitted below, it is clear that there is no consensus as to the nature of the claimant's prior or present injury; moreover, in the absence of proof that the claimant was informed that he had a ruptured disc, the evidence is insufficient to establish that the claimant had a preexisting injury/disability that he failed to mention in completing his medical questionnaires. The record supports the conclusion that LRASIF acted arbitrarily and capriciously in terminating Mr. Lanclos' workers' compensation benefits. This assignment lacks merit.

*Mr. Lanclos' Answer to the Appeal*

We now turn to Mr. Lanclos' answer to the appeal and the assignments of error raised therein. The basis for the claimant's arguments on appeal is the statutory authorization of attorney's fees and penalties outlined in La.R.S. 23:1201(F). In

16

*Burge v. Louisiana Insurance Guarantee Association*, 02-33 (La.App. 3 Cir. 5/15/02), 819 So.2d 1098, *writ denied*, 02-2209 (La. 11/15/02), 829 So.2d 427, an *en banc* decision of this court, we acknowledged that the law in effect at the time of a claimant's injury governs workers' compensation claims arising from that particular injury. Regarding the instant matter, we note that the present version of La.R.S. 23:1201(F) is the result of amendment by 2003 Acts 1204, approved July 3, 2003, and effective August 15, 2003. Before these changes were enacted, and at the time of Mr. Lanclos' accident in 2001, La.R.S. 23:1201(F) read, in relevant part, as follows:

> Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. Penalties shall be assessed in the following manner:
> (1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers' compensation insurance policy shall provide that these sums shall be paid by the insurer if the workers' compensation judge determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.
> (2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
> . . . .
> (4) In the event that the health care provider prevails on a claim for payment of his fee, penalties as provided in this Section and reasonable attorney fees based upon actual hours worked may be awarded and paid directly to the health care provider. This Subsection shall not be construed to provide for recovery of more than one penalty or attorney fee.
> (5) No amount paid as a penalty or attorney fee under this Subsection shall be included in any formula utilized to establish premium rates for workers' compensation insurance.

Accordingly, the pre-revision form of La.R.S. 23:1201 governs in the instant matter.

In Mr. Lanclos' first argument on appeal, he claims that the workers' compensation judge erred in failing to award penalties and attorney's fees for the employer's improper calculation of his average weekly wage. With regard to the issue of penalties in the event of an underpayment of benefits, the Louisiana Supreme Court noted in *Brown v. Texas-LA Cartage, Inc.,* 98-1063, p. 8 (La. 12/1/98), 721 So.2d 885, 890 that: "The unambiguous language of La.R.S. 23:1201 clearly establishes that penalties and attorney fees for failure to timely pay benefits shall be assessed unless the claim is reasonably controverted or such nonpayment results from conditions over which the employer or insurer had no control." (Footnote omitted.) Furthermore, in this case, the fact that the initial compensation benefits provided by the employer were improperly calculated was stipulated to by the parties. As the employer failed to offer evidence regarding the miscalculation arising from condition outside of its control and the matter does not appear to be reasonably controverted, we conclude that the workers' compensation judge erred in failing to award penalties for the indequate benefit payments. Accordingly, we award $2,000 in penalties due to this underpayment.

With regard to the award for attorney's fees related to the miscalculation, we note that the ruling issued by the workers' compensation judge contains an award of attorney's fees of $8,500 in the claimant's favor for the successful prosecution of his disputed claim, and we find that this amount includes fees for the improper calculation of Mr. Lanclos' average weekly wage. Accordingly, insofar as additional attorney's fees are requested, this assignment lacks merit.

We next address the claimant's contention that the workers' compensation judge erred in failing to assess a penalty with respect to the improper termination of his wage benefits. At the hearing below, the claimant was awarded back and

18

continuing temporary total disability benefits. Temporary total disability benefits are described in La.R.S. 23:1221(1)(a) as follows:

> For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.

Moreover, La.R.S. 23:1201(B) contains the following timeline for payment of temporary total disability benefits: "The first installment of compensation payable for temporary total disability, permanent total disability, or death shall become due on the fourteenth day after the employer or insurer has knowledge of the injury or death, on which date all such compensation then due shall be paid." The workers' compensation judge determined that Mr. Lanclos was entitled to temporary total disability benefits; pursuant to La.R.S. 23:1201(F), Coastal Food's and LRASIF's failure to pay these benefits results in the imposition of a penalty. Accordingly, we find that with respect to this portion of the disputed claim, a penalty is warranted in the amount of $2,000.

In his third and fourth assignments of error on appeal, Mr. Lanclos argues that a penalty should have been imposed for the employer's failure to approve medical treatment with Drs. Michael Heard and Alan Appley. As noted above, La.R.S. 23:1201(F) provides that penalties and attorney's fees may be imposed when an employer or its insurer fails to comply with the payment schedules outlined in the various subsections of La.R.S. 23:1201. With respect to payment of medical benefits, which includes authorization of physicians,[4] La.R.S. 23:1201(E) states that "[m]edical

---

[4]See *Authement v. Shappert Engineering*, 02-1631, p. 8 (La. 2/25/03), 840 So.2d 1181, 1186-87, in which the Louisiana Supreme Court stated as follows:

> One purpose of the workers' compensation statute is to promptly provide

benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof." The record reflects that LRASIF did not authorize the claimant's treatment with Drs. Heard and Appley within sixty days of its receipt of the claimant's written request. Accordingly, we find that penalties are in order in the amount of $2,000 for the failure to approve treatment with Dr. Appley and in the amount of $2,000 for the failure to approve treatment with Dr. Heard.

In his final two assignments of error on appeal, Mr. Lanclos points out that the workers' compensation judge neglected to impose a penalty for the employer's failure to pay assorted medical and pharmacy bills. As noted above, La.R.S. 23:1201(E) requires payment of medical expenses within sixty days of receipt of a written request, and, pursuant to La.R.S. 23:1201(F), penalties and attorney's fees may be imposed when an employer or its insurer fails to pay such expenses. Although Mr. Lanclos has requested an assessment of penalties for the employer's failure to timely pay medical expenses and a separate assessment for failure to timely pay prescription-drug expenses, our review of the relevant jurisprudence reveals no support for the award of separate penalties as requested in the instant appeal. Nevertheless, we find that the workers' compensation judge erred in failing to award a penalty for the employer's failure to pay the medical/pharmacy bills submitted within the parameters outlined by law, and, accordingly, we order a penalty in the amount of $2,000.

---

compensation and medical benefits to an employee who suffers injury within the course and scope of employment. The employer is obligated to "furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal." LSA-R.S. 23:1203(A). Thus, we conclude that a failure to authorize treatment can result in the imposition of penalties and attorney fees except when the claim is reasonably controverted. Depending on the circumstances, a failure to authorize treatment is effectively a failure to furnish treatment.

Finally, in his answer to the appeal, Mr. Lanclos requested additional attorney's fees for work done in defense of the workers' compensation judge's ruling in this matter. Through our review of the ruling below, we have affirmed the workers' compensation judge's decision in the claimant's favor. Accordingly, we award Mr. Lanclos an additional $5,000 in attorney's fees for work done on appeal. *See Bellanger v. LaSalle Community Action*, 02-299 (La.App. 3 Cir. 10/2/02), 827 So.2d 599.

### DECREE

For the foregoing reasons, the ruling of the workers' compensation judge is affirmed insofar as it determined that Mr. Lanclos' benefits were arbitrarily and capriciously denied, ordered that said benefits be paid, and ordered that attorney's fees be assessed against Coastal Food and LRASIF. In addition, the judgment is amended to provide for penalties of $10,000 against Coastal Food and LRASIF for the aforementioned violations of La.R.S. 23:1201(F) and to provide for an award of additional $5,000 in attorney's fees to Mr. Lanclos for work done on appeal. All costs of this proceeding are assigned to the Louisiana Restaurant Association Self Insurers Fund.

**AFFIRMED AS AMENDED.**