# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-785


MARLON LAVALAIS

VERSUS

GILCHRIST CONSTRUCTION CO., LLC



**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 13-00976
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

**\*\*\*\*\*\*\*\*\*\***

## JOHN E. CONERY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Elizabeth A. Pickett, and John E. Conery, Judges.


**AFFIRMED.**

**L. Lyle Parker**
**Christina S. Slay**
**Bolen, Parker, Brenner, Lee & Engelsman, LTD.**
**Post Office Box 11590**
**Alexandria, Louisiana 71315-1590**
**(318) 445-8236**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**Travelers Property Casualty Company of America**
**Gilchrist Construction Company, LLC**

**Maria A. Losavio**
**Losavio Law Office, LLC**
**1821 MacArthur Drive**
**Alexandria, Louisiana 71315-2420**
**(318) 767-9033**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**Marlon Lavalais**

**CONERY, Judge.**

In this workers' compensation case, Gilchrist Construction Company, LLC (Gilchrist) appeals the judgment entered in favor of its former employee, Mr. Marlon Lavalais (Mr. Lavalais), ordering Temporary Total Disability Benefits (TTDs), payment for past medical expenses, future medical treatment and expenses, past and future travel expenses, penalties, attorney fees and costs, and denying Gilchrist's special defense based on La.R.S. 23:1208.1, which would have required that all workers' compensation benefits be denied to Mr. Lavalais based on false answers to a pre-employment medical questionnaire. Mr. Lavalais answered the appeal and seeks attorney fees for appellate work. For the following reasons, we affirm as amended.

## FACTS AND PROCEDURAL HISTORY

On November 2, 2012, Mr. Lavalais was injured in a one car accident in the course and scope of his employment with Gilchrist while he was riding as a guest passenger in a vehicle owned by Gilchrist. The Gilchrist vehicle struck a sign that had fallen off a transport truck on Interstate - 49. Mr. Edward Walker, Jr., the driver of the Gilchrist vehicle and also a Gilchrist employee, then lost control and ran off the road. Mr. Lavalais allegedly sustained injuries to his neck, back, and right knee as a result of the accident.

Mr. Lavalais complained that his back hurt immediately after the accident and felt like he could not go on to work with Mr. Walker. In light of his condition, Mr. Butch Mackey, a Gilchrist's supervisor, went to the scene of the accident, conducted an inspection, took pictures, and then drove Mr. Lavalais home. Mr. Lavalais has not returned to work since the November 2, 2012 accident.

Mr. Lavalais began working for Gilchrist in August/September 2012, some three months prior to his November 2, 2012 accident. Subsequent to his hiring, on August 28, 2012, Mr. Lavalais completed and signed a medical questionnaire in conjunction with his company-required physical examination by Gilchrist's doctor. Based on the answers given and the medical examination conducted, the doctor found that Mr. Lavalais could "work with no accommodations."

The Gilchrist medical questionnaire states in boldface, underlined, capital letters at the top of the page, "**<u>YOUR FAILURE TO ANSWER ANY OF THE QUESTIONS ON THIS FORM TRUTHFULLY MAY RESULT IN YOUR FORFITURE OF WORKER'S COMPENSATION BENEFITS UNDER LA.R.S. 23:1208.1.</u>**"

Underneath the bold capitalized warning, the next sentence reads, "Indicate whether or not you currently have, have previously had, or have ever been treated for any of the following conditions. (Check box to indicate 'YES')." Mr. Lavalais answered "NO" to all of the conditions including, "KNEE INJURY, NECK INJURY AND BACK INJURY."

The next portion asks "Are you presently under any medical treatment?" Mr. Lavalais also responded "NO." To the next question, "Are you presently taking medication[,]" Mr. Lavalais also responded, "NO." Mr. Lavalais contests that it was his handwriting in the response to the follow up medication question, discussing his use of medication. The answer to this portion of the questionnaire stated, "Not Regular. Lortab PRN. Left arm pain due to old football injury." Mr. Lavalais testified that he did not write the answer to this portion of the questionnaire, which appears to be signed by Dr. Edwards, who conducted the pre-hire physical on Mr. Lavalais.

2

Following the rest of the questions, to which Mr. Lavalais responded "N/A."[1] is another statement, also capitalized, in boldface, and underlined, which provides: "**WARNING-PURSUANT TO LSA 1208.1, I UNDERSTAND THAT THE FAILURE TO ANSWER ANY OF THESE QUESTIONS TRUTHFULLY MAY RESULT IN THE DENIAL OF ANY RIGHT I OR MY DEPENDENTS MAY HAVE TO [WORKERS'] COMPENSATION BENEFITS, INCLUDING WEEKLY BENEFITS, MEDICAL TREATMENT AND EXPENSES, UNDER R.S. 23:1208.1**."

Mr. Lavalais then signed and dated the document "8/28/2012," underneath the statement, "I HAVE READ AND UNDERSTOOD THE MEDICAL QUESTIONNAIRE. I HAVE ALSO REVIEWED THE ANSWERS TO THE MEDICAL QUESTIONNAIRE AND THEY ARE CORRECT."

In connection with their investigation of the November 2, 2012 accident, through a conversation between Mr. Lavalais and Ms. Kim Sandrock, the adjuster for Gilchrist's workers' compensation carrier, Travelers Insurance Company, Gilchrist learned that Mr. Lavalais had previously injured his neck, back, and right knee, had received medical treatment for those injuries, and had failed to disclose same on his pre-employment questionnaire and medical examination. Gilchrist then denied Mr. Lavalais request for workers' compensation payments, based on La.R.S. 23:1208.1 (emphasis added), which states:

> Nothing in this Title shall prohibit an employer from inquiring about previous injuries, disabilities, or other medical conditions and the employee shall answer truthfully; *failure to answer truthfully shall result in the employee's forfeiture of benefits under this Chapter, provided said failure to answer directly relates to the medical condition for which a claim for benefits is made* or affects the employer's ability to receive reimbursement from the second injury

---

[1] "N/A" is "not applicable."

fund. This Section shall not be enforceable unless the written form on which the inquiries about previous medical conditions are made contains a notice advising the employee that his failure to answer truthfully may result in his forfeiture of worker's compensation benefits under R.S. 23:1208.1. Such notice shall be prominently displayed in bold faced block lettering of no less than ten point type.

Based on Gilchrist's denial of benefits, on February 8, 2013, Mr. Lavalais filed a Louisiana Department of Labor (LDOL) Form 1008, seeking workers' compensation benefits and medical care in connection with the November 2, 2012 accident. On March 19, 2013, Gilchrist filed an answer to the workers' compensation claim/petition filed by Mr. Lavalais on Form 1008 stating, "Marlon Lavalais the employee, violated the provisions of 23:1208.1 and therefore forfeits any benefits that would otherwise have been owed to him."[2]

After a trial on the merits, the workers' compensation judge (WCJ) found:

[A]nd the employer took a recorded statement, their adjuster took a recorded statement from him and they learned in the recorded statement that Mr. Lavalais had, in the past, sustained a right-knee injury and had some neck and back problems in the past. Based on the medical questionnaire that Mr. Lavalais signed at the time of his employment with Gilchrist Construction Company, they contended that he violated Revised Statute 23:1208, misrepresentation statute, and was not entitled to receive any workers' compensation benefits. Accordingly, they never began paying any indemnity or authorized any medical care for Mr. Lavalais. [3]

The WCJ nevertheless concluded that Gilchrist "failed to establish forfeiture under La. Revised Statute 23:1208.1," and awarded Mr. Lavalais TTDs at the rate of $320.43 per week beginning November 3, 2012, and continuing, plus legal interest. The WCJ ordered that Mr. Lavalais was entitled to continuing medical

---

[2] Gilchrist's pre-trial memorandum states its defense to Mr. Lavalais' claim is under both La.R.S. 23:1208 and La.R.S. 23:1208.1. However, in its post-trial memorandum, Gilchrist argues the only applicable statute that was before the WCJ was La.R.S. 23:1208.1.

[3] As clarified in the record, Gilchrist's defense was based solely on La.R.S. 23:1208.1.

4

treatment from his treating physicians Dr. Mounayar and Dr. Blanda, including but not limited to lumbar surgery, knee surgery, and cervical surgery in accordance with the Louisiana Fee Schedule. The WCJ awarded past medical and medical travel expenses in the amount of $16,607.07 and $1,349.82 respectively, plus legal interest until paid. The trial court also awarded penalties totaling $4,000.00, attorney fees of $12,000.00, and costs of $2,525.83, plus legal interest until paid. The WCJ's judgment was signed on May 13, 2014, from which Gilchrist now timely appeals.

## ASSIGNMENT OF ERROR

The Honorable Lower Court erred in finding the employee did not forfeit his benefits under La.R.S. 23:1208.1, where the employee responded untruthfully to the employer's post-hire medical questionnaire.

## LAW AND ANALYSIS

### *Standard of Review*

The standard of review in a workers' compensation claim is well established. In *Lanclos v. Coastal Food, LLC*, 04-222 (La.App. 3 Cir. 7/7/04), 877 So.2d 309, a panel of this circuit correctly summarized the standard of review when the employer has claimed that all benefits to an employee should be denied based on La.R.S. 23:1208.1, one of two anti-fraud statutes. In *Lanclos*, the court stated:

> In general, an appellate court reviews the factual determinations of a workers' compensation judge pursuant to the manifest error-clearly wrong standard. *Apeck Constr., Inc. v. Bowers,* 03-486 (La.App. 3 Cir. 12/10/03), 862 So.2d 1087, *writ denied,* 04-459 (La.4/23/04), 870 So.2d 301. This is likewise the standard of review where an employer has alleged that a claimant has committed fraud pursuant to La.R.S. 23:1208.1. *See Colonial Nursing Home v. Bradford,* 02-588 (La.App. 3 Cir. 12/30/02), 834 So.2d 1262, *writ denied,* 03-364 (4/21/03), 841 So.2d 802. Where conflict in testimony arises, a workers' compensation judge's reasonable factual inferences and reasonable assessments of credibility are not to be disturbed on appeal, despite the beliefs of a reviewing court that its inferences or

5

evaluations are more reasonable. *Williamwest v. Am. Studios/PCA Int'l, Inc.,* 02-98 (La.App. 5 Cir. 9/30/02), 827 So.2d 526. However, an appellate court may conclude that the workers' compensation judge's findings were manifestly erroneous or clearly wrong, even when ostensibly based upon a credibility determination, "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story[.]" *Town of Grand Isle v. Eschette,* 02-96, p. 8 (La.App. 5 Cir. 5/29/02), 820 So.2d 1122, 1128, *writ denied,* 02-1810 (La.10/4/02), 826 So.2d 1131 (quoting *Bruno v. Harbert Int'l, Inc.,* 593 So.2d 357, 361 (La.1992)).

*Lanclos*, 877 So.2d at 318 (alterations in original).

As recently reiterated in *Aisola v. Beacon Hosp. Mgmt. Inc.*, 13-1101, pp. 8-9 (La.App. 4 Cir. 4/2/14), 140 So.3d 71, 77-78 (alterations in original), a *de novo* review is applied when this court finds legal error:

However, "[w]hen legal error interdicts the fact-finding process in a workers [sic] compensation proceeding," our review of those findings is conducted *de novo. Tulane Univ. Hosp. & Clinic v. Lockheed Martin Corp.,* 11–0179, p. 3 (La.App. 4 Cir. 6/29/11), 70 So.3d 988, 990 (citing *MacFarlane v. Schneider Nat'l Bulk Carriers, Inc.,* 07–1386, p. 3 (La.App. 4 Cir. 4/30/08), 984 So.2d 185, 188). We likewise review the WCJ's legal conclusions *de novo. Id.* (citing *MacFarlane,* 07–1386, p. 3, 984 So.2d at 188).

### *Louisiana Revised Statutes 23:1208.1*

After relating an extensive legislative history of both La.R.S. 23:1208 and 1208.1, in *Resweber v. Haroil Const. Co*., 94-2708, 94-3138, p. 10 (La. 9/5/95), 660 So.2d 7, 14 (footnotes omitted), the supreme court clarified the difference between La.R.S. 23:1208 and La.R.S. 23:1208.1:

We therefore hold that Section 1208 applies to any false statement or misrepresentation, including one concerning a prior injury, made willfully by a claimant for the purpose of obtaining benefits, and thus is generally applicable once an accident has allegedly occurred and a claim is being made. Section 1208.1, on the other hand, applies to false statements or misrepresentations made pursuant to employment-related inquiries regarding prior medical history such as in an employment application or some post-

6

employment questionnaire and not to statements made in relation to a pending claim.

Gilchrist claims that Mr. Lavalais should forfeit his benefits under La.R.S. 23:1208.1 because of his failure to answer truthfully the questions about his neck, back, and knee, which "directly relates to the medical condition for which a claim for benefits is made."[4] In order to succeed on this claim, Gilchrist must prove the necessary elements for a claim of fraud that would require that Mr. Lavalais forfeit his benefits, as summarized by a panel of this court in *City of Eunice v. Carrier*, 01-1184, p. 3 (La.App. 3 Cir. 2/20/02), 821 So.2d 3, 7:

> There are three component parts to establishing a Section 1208.1 violation: (1) untruthfulness; (2) prejudice; and (3) notice.
>
> Furthermore, the claimant must do more than simply provide untruthful answers before forfeiting benefits. The employer must also prove that the untruthful statements were prejudicial to it and that it provided the employee with statutory notice. La.R.S. 23:1208.1 applies when an employee is dishonest on an employer's medical questionnaire before the accident or injury. [*Resweber v. Haroil Const. Co.*, 94-2708, 94-3138 (La.9/5/95), 660 So.2d 7.] In *Resweber v. Haroil Const. Co.*, the supreme court concluded that the legislature imposed forfeiture under La.R.S. 23:1208.1 strictly for when the employer suffers prejudice. An employer is prejudiced only when the false statement "directly relates to the medical condition for which a claim is made or affects the employer's ability to receive reimbursement from the second injury fund." La.R.S. 23:1208.1
>
> . . . .
>
> Because statutory forfeiture is a harsh remedy, its application must be strictly construed.

Thus, Gilchrist maintains the burden of proving three elements to avoid liability under the statute. "There must be an untruthful statement; prejudice to the employer; and compliance with the notice requirements of the statute." *Wise v. J.E. Merit Constructors, Inc.*, 97-684, p. 7 (La. 1/2/98), 707 So.2d 1214, 1218; *see*

---

[4] Gilchrist did not claim that Mr. Lavalais answers affected its ability to recover from "the second injury fund."

*also Taylor v. G.W. Morgan Logging Co., Inc.*, 12-294 (La.App. 3 Cir. 10/3/12), 100 So.3d 341.

### *Notice - Gilchrist Medical Questionnaire*

There was no dispute between the parties that Gilchrist gave the proper notice required by La.R.S. 23:1208.1 on the medical questionnaire presented to and completed by Mr. Lavalais.

### *Mr. Lavalais Answers - The Gilchrist Medical Questionnaire*

The WCJ found, with respect to the questions on the Gilchrist medical questionnaire, that "the employer failed to establish forfeiture under Revised Statute 23:1208.1," and stated:

> The questions with regard to his back and his neck were very innocuous questions, did he have neck pain or did he have back pain. And he did, but he responded, no, but such questions do not ever give employer information of previous permanent/partial disability known by the injured worker.
>
> So, the Court concludes that there – the employer has failed to establish forfeiture under Revised Statute 23:1208.1.

The Gilchrist medical questionnaire clearly provides that if an employee has answered "yes" by checking any of the conditions listed above, then it states, "please explain in detail on the bottom of this form the nature of your injury or condition, the type of treatment received, the date of last treatment and the name and address of treating doctor."

In *Wise*, 707 So.2d at 1222, the supreme court discussed the burden of an employer and provided, "ambiguous answers cannot satisfy an employer's burden of proving knowledge regarding the presence of a [partial/permanent disability]. Absent an employer's attempt to clarify ambiguous answers, an employer fails to

8

prove that claimant has knowingly made an untruthful answer for which forfeiture is justified."

It is undisputed that Mr. Lavalais answered "NO" to each of the three questions pertaining to his neck, back, and knee, which asked "whether or not you currently have, previously had, or have ever been treated for any of the following conditions." "[O]ur jurisprudence provides that an employee 'fails to answer truthfully when he clearly indicates 'no' on the employer's questionnaire, denying the existence of a known medical condition.'" *Babin v. Ernest P. Breaux Elec., Inc.*, 10-305, p. 4 (La.App. 3 Cir. 10/6/10), 49 So.3d 473, 476 (quoting *Alexis v. Alton Ochsner Found. Hosp.,* 03–1775, p. 4 (La.App. 4 Cir. 2/25/03), 869 So.2d 121, 124). "No" is not an ambiguous answer.

Mr. Lavalais testified at the hearing that he graduated from high school in 1997 and attended a couple of semesters at Northwestern State University directly after his high school graduation. In response to questions concerning the Gilchrist medical questionnaire, Mr. Lavalais confirmed that all the responses were in his hand writing, that he had answered "No" to the questions concerning his neck, back, and knee, and that he signed the form. In explaining his responses, Mr. Lavalais testified:

Q.   So, this is this medical questionnaire.

A.   Yes, ma'am.

Q.   All right. And all these "No's", solid "no's" on here, those are all your handwriting, correct?

A.   Yes, ma'am.

Q.   And you're not telling the Court anything other than, "Oops, I - - it should have been a 'yes' on a couple of those spots," right?

A.   Yes, ma'am.

9

Q. All right. Tell us which spots it should have 'been a "Yes." How about the knee? Now that we've gone over and you know what this form says, if you had to fill it out today, would you have put "Yes" there?

A. Of course.

Q. A neck?

A. Yes, ma'am. Definitely.

Q. And back?

A. Yes, ma'am.

Q. All right. Now, why didn't you put "Yes" that day? Tell me what you were --

A. Ms. Losavio, I really wasn't trying to be misleading or trying to just get over, or something. When they asked these questions, you know, on a lot of these, I thought they were asking, "What currently hurts you at the time?" I mean, if I knew this, I would have put it down, but I -- like I said, I wasn't [trying] to lie or be misleading about the situation. When they asked me the question, like I say, I had a lot of paperwork. I'm-not denying that I put "No," but I thought they were asking what's hurting me right now.

Q. At the time you were completing it?

A. At the time I was completing it, and you know, I was good.

Q. Okay. Now, it doesn't say that, though, on the form. It asked if you've ever had it.

A. Yes, ma'am. Yes, ma'am.

Q. It says, "Currently," as well. It says, "Currently or previously, or ever," and I pointed that out to you, remember that, when we talked about this form?

A. Yes, ma'am.

Q. Okay. Do you now understand that it was asking, ever, ever, ever, ever, not just at the time?

A. Now I do.

Q. Okay. And, in fact, did you tell the claims adjuster about your prior injuries to your knee, your neck and your back when she took your recorded statement just a few days after the accident?

A. Yes, ma'am. I did tell her.

Q. And, of course, Dr. Mounayar knows about it, because he treated you for the prior motor vehicle accident, May of 2011, so he knew about them?

A. Yes, ma'am.

Although Mr. Lavalais may now regret that he failed to disclose his prior injuries to his neck, back, and knee, as he was able to work at his job as a laborer for Gilchrist, those untruthful answers to Dr. Edwards on his pre-employment physical may have led Dr. Edwards to place restrictions on Mr. Lavalais' work for Gilchrist and may have affected the employer's decision to hire Mr. Lavalais. Our jurisprudence interpreting La.R.S. 23:1208.1 holds that if Mr. Lavalais failed to answer truthfully when he clearly indicated "No" to his answers on the Gilchrist medical questionnaire concerning his prior medical history of injuries to his neck, back, and knee, his entitlement to workers' compensation benefits may be forfeited under La. R.S. 23:1208.1. *See Babin*, 49 So.3d 473.

As in *Babin*, the clearly worded statement on the Gilchrist medical questionnaire that preceded the questions to which Mr. Lavalais answered "No," included the statement, "*Indicate whether or not you currently have, have previously had, or have ever been treated for any of the following conditions.*" (Emphasis added.) Mr. Lavalais testified at trial that he had a high school education and had attended college. He also testified that he had worked for Boise Cascade doing heavy manual labor at the time of his knee injury in 2006 and that he was off from work for approximately six months. Mr. Lavalais chose not to undergo surgery for the ACL tear in his right knee because he did not want to miss

11

work. However, all of his treating physicians are in agreement that surgery would be required to repair an ACL tear, which is now considered a chronic condition.

Mr. Lavalais had an ongoing lawsuit in connection with the prior May 2011 automobile accident, which eventually settled, wherein he claimed damages to his neck, back, and knee. Mr. Lavalais testified that he was unsure if it settled before or after the time he completed the Gilchrist medical questionnaire. Mr. Lavalais was never released by Dr. Mounayar, his treating physician for the May 2011 accident, and in March 2012, prior to his hiring in August/September 2012 by Gilchrist, he was still experiencing pain in his neck, back, and knee.

Based on the record, the deposition testimony, the medical records submitted into evidence, and the jurisprudence interpreting La.R.S. 23:1208.1, the WCJ was manifestly erroneous in his determination that Mr. Lavalais was not untruthful, as defined by the statute and jurisprudence, in his answers to the Gilchrist medical questionnaire. We conclude that he was untruthful.

We must now address the third prong of Gilchrist's burden of proof under the forfeiture statute, La.R.S. 23:1208.1: did the untruthful statements made by Mr. Lavalais on the Gilchrist medical questionnaire concerning his neck, back, and right knee cause prejudice to Gilchrist.

### Direct Relation Test - Prejudice To Gilchrist

In order to carry its burden of proof under this portion of the analysis, Gilchrist is required to prove that Mr. Lavalais' untruthful answers directly relate to the medical conditions at issue. "Direct relation is established when subsequent injury was inevitable *or very likely to occur because of presence of preexisting condition*, and is not based on mere anatomical connexity." *Taylor*, 100 So. 3d at 345 (emphasis added).

12

On May 5, 2014, in his oral reasons for judgment, the WCJ stated on the record, "that [Gilchrist] has failed to show that the injury sustained by Mr. Lavalais to his right knee, his back and his neck in the incident that occurred on November 2, 2012 was *inevitable* because of his past conditions." The WCJ failed to make any determination of the second portion of the "direct relation" analysis, was the injury "*very likely to occur because of the presence of preexisting condition.*" (Emphasis added.) The WCJ's failure to address the second portion of the direct relation analysis is the main focus of Gilchrist's assignment of error.

The record reflects that the WCJ did not discuss the testimony from Mr. Lavalais' treating physicians or the medical records that supported Gilchrist's contention that, due to Mr. Lavalais' previous unresolved injuries to his neck, back, and the unrepaired ACL tear in his right knee, these areas, having once been damaged, were more susceptible to re-injury, and that subsequent injury was "very likely to occur" because of the presence of these preexisting conditions, pursuant to La.R.S. 23:1208.1. *See Wise*, 707 So.2d 1214; *Taylor*, 100 So.3d 341.

We have reviewed the record containing the portions of the testimony of Mr. Lavalais' treating physicians and the Independent Medical Examination (IME) conducted by Dr. Joe Morgan in order to determine whether the subsequent injury was "very likely to occur" because of the presence of Mr. Lavalais' undisclosed preexisting conditions. We summarize the pertinent portions of the record below, beginning with the testimony of Dr. Phillip Bacilla.

### Dr. Phillip Bacilla

Dr. Bacilla treated Mr. Lavalais after he suffered an injury to his right knee in 2006, following a four-wheeler accident. Dr. Bacilla ordered an MRI of the right knee which revealed a torn ACL, which would have required surgery to

13

repair.  Mr. Lavalais was hesitant about undergoing surgery then as it would have disabled him from his ability to work.  He indicated that he was not experiencing any instability in the knee, but in the event he began experiencing instability, he would reconsider a surgical procedure.  Therefore, at the time of the accident on November 2, 2012, Mr. Lavalais' ACL tear was termed chronic.  In his deposition, Dr. Bacilla testified that Mr. Lavalais' 2006 knee injury made any subsequent injury more likely to occur:

> Q. And does a knee injury such as the one that Mr. Lavalais sustained back in November of 2006, I believe it was -- does it lead a person or make him **more susceptible** to an injury of that knee in the future?
>
> A. Yes.
>
> Q. And does it make a subsequent injury to his right knee **more likely to occur** than had he not had that prior incident?
>
> A. Yes.

Dr. Bacilla further testified:

> Q. And the injury that he sustained in 2006, can it lead to these new injuries, these new findings, --
>
> A. Yes.
>
> Q.  -- if he were to be involved in an accident later down the road?
>
> A. Yes.

(Emphasis added.)

Dr. Bacilla was cross-examined by Mr. Lavalais' counsel and further testified:

> Q. Doctor, I just have a couple of follow-up questions. Let's assume that Mr. Lavalais --- The accident that we're here about occurred in November of 2012. Let's assume that in May of 2011 Mr. Lavalais was involved in another accident where he complained of right knee pain. Based upon the questioning that

> Counsel just asked you, the prior complaints of the knee pain in 2011, **that could have made everything worse**; right?

A. Well, he could have reinjured the knee then and, then, he wasn't asymptomatic before his 2012. If he had complaint of knee pain in 2011, that means he wasn't asymptomatic between the - before the accident in 2012.

Q. And with any kind of chronic conditions such as the one Mr. Lavalais had in his right knee since 2006, any injury to it from then on **would cause the symptoms to become worse**, his condition to become worse, is that right?

A. **Could, yes**.

(Emphasis added.)

The distinction here is that Dr. Bacilla used terms such as "could" and "more likely to occur," whereas the "direct relation test" requires the employer to prove the subsequent injury was "inevitable" or "very likely to occur because of the presence of a preexisting condition." *See Wise*, 707 So.2d 1214, *Taylor*, 100 So. 3d 341.

### *Dr. Louis Blanda*

Mr. Lavalais was referred to Dr. Blanda for treatment after the November 2, 2012 work-related accident. Dr. Blanda confirmed Dr. Bacilla's testimony concerning the link between a prior injury and re-injury to the same area. Dr. Blanda testified:

Q. Okay. With an ACL tear such as the one that Mr. Lavalais suffered in approximately 2006, does an ACL tear ever heal itself?

A. Generally, no.

Q. So, once the ACL is torn, it stays that way?

A. Yes.

Q. And having that type of prior injury, does it leave the knee susceptible to further injury?

15

A.    **It could,** yes.

Q.    And if Mr. Lavalais had another trauma to his knee, could having that ACL tear that's not been repaired, could that **make him more susceptible to reinjury** and further injury of that area?

A.    Yes.

Q.    And further injury such as the torn meniscus that he is showing to have now?

A.    **That's possible**, sure.

Q.    And if we assume that Mr. Lavalais was involved in that accident in May 2011 where he suffered pain and received treatment for his right knee, would having that prior injury - so, the two prior injuries - would that leave his knee even more susceptible to further injury of that area?

A.    **It could**.

(Emphasis added.)

Dr. Blanda further testified:

Q.    Okay. And when an area of the body is weakened such as with his knee, when it's weakened like that, it can make additional trauma or damage easier to occur in that weakened area?

A.    Well, yeah, the weak -the weakening of it can **make it more susceptible to further damage with another trauma or some type of injury, yes.**

Q.    Okay. Now, with regard to his low back, let's assume that Mr. Lavalais sustained an injury to his low back in the May 2011 Accident. Can having an injury to your low back make another injury - another traumatic event, could it weaken that area to where it could cause further injury or reinjury to that area?

A.    **It could** if it stays symptomatic or if a test like an MRI showed some ligament tears or some objective signs of damage. It can weaken it enough where another trauma can make it worse.

(Emphasis added.)

During his deposition testimony, Dr. Blanda further explained the difference between the two types of muscular injuries that can occur after a trauma to the low back. The first is a soft tissue muscle strain, and the second is a ligament sprain or strain. In explaining the time required for a person to heal from each type of muscular injury, Dr. Blanda testified that a ligament sprain or strain could cause the area further damage or instability. In contrast to the soft tissue muscle strain, which usually requires only a few weeks to heal, it requires several months for a ligament sprain or strain to heal.

Concerning Mr. Lavalais' condition, Dr. Blanda testified:

Q. So, if - let's assume that Mr. Lavalais sustained the injury in May 2011, and treated through March 2012 for neck and back complaints. What would that lead you to believe?

A. He was injured in May and he went almost a year in treatment?

Q. Almost a year.

A. I'd say maybe he had a ligament sprain, something a little more substantial than a muscle injury.

Q. Okay. And having that type of prior injury, such as a ligament strain, could weaken the area and make it - **make an individual susceptible to [re-injury]**, further injury of that area?

A. **I think so, yes**.

Q. Including resulting in disc issues?

A. Yes.

(Emphasis added.)

Again, there was no testimony from Dr. Blanda that re-injury was "inevitable" or "very likely to occur" pursuant to the "direct relation test" outlined in *Wise* and *Taylor*.

17

*Dr. Elias Raymond Mounayar*

Mr. Lavalais treated with and had not been released by Dr. Mounayar for the injuries he sustained to this neck, back, and right knee in the previous non-work related May 5, 2011 automobile accident. Mr. Lavalais also sought treatment from Dr. Mounayar after the work related November 2, 2012 accident.

Dr. Mounayar testified about his treatment of Mr. Lavalais with regard to his neck and back pain as follows:

> Q. When a person has an injury such as Mr. Lavalais sustained in the May 2011 accident, and I want to talk with regard to his neck pain first, his neck injury, does that make that person more susceptible to an injury, a reinjury in that area?
>
> A. **It can** if the accidents are back to back in a short time between the accidents, it can. Even if somebody is not complaining currently or had an absence of neck pain, complete absence of neck pain but the accident was close enough, yes, it can influence.
>
> Q. What about with regard to the low back, same question?
>
> A. Same thing.
>
> Q. With regard to the right knee pain, can him having first the ACL injury a couple of years before the 2011 accident, the reinjury in 2011 and then complaints of pain following the 2012 accident, can those series of injuries make him more susceptible to an injury in his knee?
>
> A. **That's possible**.

(Emphasis added.)

Dr. Mounayar testified that when he last saw Mr. Lavalais on March 9, 2012, for his injuries sustained in the May 5, 2011 accident, Mr. Lavalais was continuing to complain of neck pain, rating his pain at an eight on a scale of one to ten. As Mr. Lavalais had not shown any improvement, Dr. Mounayar recommended he see an orthopedist for a consult for his neck. Mr. Lavalais also complained of right knee

pain that had resulted from his stepping on an uneven surface. At that point in time, Mr. Lavalais was receiving medication from Dr. Mounayar for pain, Lortab ten. Dr. Mounayar likewise did not offer testimony that re-injury was "inevitable" or "very likely to occur." *See Wise*, 707 So.2d 1214; *Taylor*, 100 So.3d 341.

### *Dr. Joe Morgan*

Mr. Lavalais was also referred to Dr. Morgan for an IME on July 22, 2013. Dr. Morgan issued an IME report on July 22, 2013, which was filed in the record as evidence. Dr. Morgan was also deposed and testified:

> Q. And would sustaining a prior tear to the ACL make an individual more susceptible to a subsequent injury of that area?
>
> A. Yes.

However, in its reasons for ruling, the WCJ focused on the next question asked to Dr. Morgan, and stated:

> He reviewed the past medical records from Dr. Basilla and Dr. Mounayar and previous MRIs of Mr. Lavalais' knee. He indicated that Mr. Lavalais had a chronic ACL tear. On Page 16, Line 21 of Dr. Morgan's deposition, which was taken September 10, 2013, Dr. Morgan was asked would it also make the patient more susceptible to further knee – injury of the knee. And Dr. Morgan's response was, "**I don't know if it makes any further injury, but an ACL tear goes unrepaired will cause the knee to develop degenerative arthritis**."
>
> Page 17, Line 9: "**Could it make a subsequent injury to that area inevitable**?" His response at Line 13 was, "**Oh, I don't know if it makes it inevitable**, but it won't **take as much stress and strain to a knee that's never been injured**."
>
> Page 17, Line 17: "So, it definitely makes it more susceptible or likely to occur that there would be an injury in that area at a later time?" His response, Line 21, "**Well, I don't know. I don't know if it does or not**."

(Emphasis added.)

However, when Dr. Morgan was questioned about Mr. Lavalais' overall condition, concerning his neck, back, and knee and his treatment by Dr. Mounayar,

19

Dr. Morgan testified, "It is an aggravation of something that was - this accident we're talking about today it seems to me an aggravation of something that was probably ongoing because they treated with him a pretty long time before. And it looked like he never got well from all three areas."

The portions of the testimony cited by this court from Mr. Lavalais' treating physicians and Dr. Morgan who performed the IME are very compelling. Clearly, Mr. Lavalais' neck, back, and knee were previously injured and were "more susceptible to re-injury" from a subsequent accident such as the one at issue. All of the medical evidence indicates that Mr. Lavalais did sustain an aggravation of a preexisting condition in his neck, back and knee, and that more likely than not made him more susceptible to re-injury in those areas. However, according to *Wise* and *Taylor*, the employer must meet an even higher standard in order to escape liability. It must prove that Mr. Lavalais' injury was either "inevitable" or "very likely to occur." None of the doctors testified that Mr. Lavalais' re-injury was "inevitable" or "very likely to occur," within the plain wording of the applicable jurisprudence.

The testimony of Mr. Lavalais' treating physicians, as well as that of Dr. Morgan, does not clearly establish that Mr. Lavalais' undisclosed preexisting injuries were prejudicial to Gilchrist. In making this determination, we have taken into consideration the constraints imposed by the supreme court that "[f]orfeiture is a harsh remedy. Thus, statutory forfeiture must be strictly construed." *Wise*, 707 So.2d at 1218. We must apply the legislative mandate which requires this court to interpret La.R.S. 23:1208.1 in a manner which "effectuates" relief "for workers when their injuries are work related." *Wise*, 707 So.2d at 1220.

Based on the record before us, we are constrained to affirm the judgment of the WCJ, and find that there is a reasonable basis in the record for his decision to find that Gilchrist was not prejudiced by the non-disclosure and to award benefits to Mr. Lavalais. This court's determination is bolstered by Mr. Lavalais' work history with Gilchrist in which he demonstrated his capacity to work without restrictions as a laborer over the period of his employment until the time of the vehicle accident. Further, the injuries allegedly suffered by Mr. Lavalais as a result of the vehicle accident, although in the course and scope of his employment with Gilchrist, were the result of additional trauma due to an unavoidable vehicle accident while Mr. Lavalais was in route to the job site, and not "while the employee was performing the regular job duties for the employer." *Cudd v. George Koch & Sons*, 94-372, p. 3 (La.App. 3 Cir. 11/2/94), 649 So.2d 505, 507, *writ denied*, 94-2929 (La. 2/9/95), 650 So.2d 244. In *Alexis*, a panel of the fourth circuit affirmed the denial of workers' compensation benefits to an employee who failed to disclose a back problem and whose job responsibilities required him to lift patients more than once a week.

Therefore, we find that the Gilchrist medical questionnaire met the requirements for notice, and that Mr. Lavalais was untruthful in his responses to the Gilchrest medical questionnaire. However, we do not find that Gilchrist carried its burden of proof under the direct relationship test element of La.R.S 23:1208.1, prejudice to his employer, Gilchrist. *See Wise*, 707 So.2d 1214; *Taylor*, 100 So.3d 341.

**Attorney Fees**

Mr. Lavalais answered the appeal and seeks additional attorney fees for work required to respond to the Gilchrist appeal. The standard for an award of

21

attorney fees on appeal, "An increase in attorney fees is awarded on appeal when the defendant appeals, obtains no relief, and the appeal has necessitated more work on the part of the plaintiff's attorney, provided that the plaintiff requests such an increase." *Dugas v. AutoZone, Inc.*, 12-727, p. 12 (La.App. 3 Cir. 12/5/12), 103 So.3d 1271, 1279, *writ denied*, 13-45 (La. 2/22/13), 108 So.3d 775 (quoting *McKelvey v. City of DeQuincy*, 07–604, (La.App. 3 Cir. 11/14/07), 970 So.2d 682). As we have affirmed the judgment of the WCJ, we will award Mr. Lavalais an additional $2,500.00 for work on this appeal.

## CONCLUSION

The judgment of the Workers' Compensation Judge is affirmed for the reasons set forth above. We award an additional $2,500.00 in attorney fees for Mr. Lavalais' counsel's work on appeal. All costs of this appeal are assessed against Gilchrist Construction Company, LLC.

**AFFIRMED.**